C. C. ANDERSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Anderson v. Commissioner
Docket No. 5172-77.
United States Tax Court
T.C. Memo 1983-654; 1983 Tax Ct. Memo LEXIS 134; 47 T.C.M. (CCH) 194; T.C.M. (RIA) 83654; October 27, 1983. H. A. Stephens, Jr., for the petitioner. Charles P. Hanfman, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1971
$217,682.00
$108,841.00
1972
217,958.00
108,979.00
1973
221,032.58
110,516.29
$536.47
*135 At trial, respondent advised that due to a recomputation of various expenses that petitioner incurred in running a lottery, the correct [1] deficiencies and additions to petitioner's Federal income taxes for the years in issue are: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1971
$73,314.00
$36,657.00
1972
74,125.00
37,062.00
1973
97,990.21
48,995.10
536.47 [2]
After concessions by the parties, and our granting of respondent's Motion for a Partial Summary Judgment which collaterally estopped petitioner from denying that he received gross wagers from conducting a lottery, the issues for decision are: (1) whether petitioner received taxable income from conducting a lottery; and (2) whether petitioner is liable for the fraud addition to tax under section 6653(b) for the years in issue. FINDINGS OF FACT Pursuant to our order of January 6, 1982, declaring absolute the Court's Order to Show Cause under Rule 91(f) [3] dated November 27, 1981, certain facts have been deemed established for purposes of this case. *136 Rule 91(f)(3). These facts, together with the exhibits attached thereto, are incorporated herein by this reference. C. C. Anderson (hereinafter petitioner) resided in Dawsonville, Georgia, when he filed his petition in this case. During the years in issue, petitioner filed joint Federal income tax returns with his wife, Carole Anderson, with the Internal Revenue Service Center, Chamblee, Georgia. Throughout the years in issue, petitioner owned, directed, and financed an illegal lottery in the Atlanta, Georgia, metropolitan area from which he received the major share of the profit. Petitioner's lottery was a "stocks and bonds" lottery in which the winning three digit number was determined by the published results of trading on the New York Stock Exchange. [4] Wagers could be placed on any one of 1,000 numbers from 000 through 999. The payout rate was 300 to 1 on three way, triple, and cut numbers, and 500 to 1 on noncut six way numbers. [5] Generally, petitioner paid out 44 percent of the gross wagers on hits (i.e., winning numbers). [6] In petitioner's lottery, *137 a bettor placed a bet with a "writer" by telling the writer the three digit number that he or she wished to bet on.The writer then forwarded the wagers to a "ribbon" who supervised the writers and who in turn forwarded the wagers via "pickup men" [7] to the appropriate individuals. *138 The writers were paid a commission of 25 percent of the gross wagers as compensation for their services. Ribbons were paid a commission of 7.5 percent of gross wagers, and pickup men were paid a commission of 6.75 percent of gross wagers. In addition to the ribbons, writers, and pickup men, petitioner also employed approximately ten salaried employees who assisted in the receipt and transmittal of bettors' numbers. These employees received weekly salaries and commissions totalling approximately $1,988.34 throughout the years in issue. [8] On an annualized basis, these salaries totalled $103,393.68, $103,393.68, and $87,486.96 for the taxable years 1971, 1972, and 1973, respectively.Throughout the years in issue, petitioner also incurred average monthly expenses of $64.53 for trailer rental, electricity, and telephones used in his lottery business resulting in total annual expenses of $774.36, $774.36, and $709.83 during 1971, 1972, and 1973, respectively. *139 From October 15, 1973 through October 26, 1973, the Federal Bureau of Investigation (FBI) conducted a court ordered wire tap of a telephone number used by the individuals who assisted petitioner in perpetrating the lottery scheme. On November 2, 1973, pursuant to valid search warrants, the FBI seized lottery records and other documents related to petitioner's lottery operation. Thereafter, on November 8, 1973, respondent made a jeopardy assessment against petitioner in the amount of $81,620 for wagering excise taxes accruing between June and November 1973. Pursuant to the jeopardy assessment, respondent levied on certain of petitioner's bank accounts and seized a total of $15,962.80 in partial satisfaction of the excise tax deficiency. Petitioner sued for a refund of the seized wagering excise taxes on October 7, 1974, and the United States subsequently counterclaimed for the full amount of wagering excise taxes due for the period between October 1967 and November 1973. On April 26, 1979, the United States District Court for the Northern District of Georgia entered a judgment that petitioner owed a total of $929,450.60 in unpaid wagering excise taxes. This wagering excise *140 tax liability was predicated upon the District Court's determination that petitioner received gross wagers in the amounts of $1,526,868.00, $1,520,809.00, and $1,290,567.00 for the taxable years 1971, 1972, and 1973, respectively. [9] On January 25, 1982, we granted respondent's Motion for a Partial Summary Judgment which collaterally estopped petitioner from denying that he received gross wagers in the above stated amounts during the years in issue. *141 Prior to the District Court's decision in the excise tax refund suit, on March 20, 1975, petitioner was convicted in the United States District Court for the Northern District of Georgia of conspiracy to "conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business * * *." The grand jury indictment upon which petitioner's conviction was based, charged petitioner with running "an illegal numbers lottery business involving more than five persons, which [was] in substantially continuous operation for a period in excess of thirty days and which [had] a gross revenue of $2,000 in any single day." This indictment also contained a second count which charged petitioner with aiding and abetting the other individuals who assisted in the perpetration of the illegal lottery. A jury convicted petitioner on both counts and the United States District Court for the Northern District of Georgia entered judgment accordingly. Petitioner's Federal income tax returns for 1971 and 1972 were prepared by Raymond Aheart and R. S. Henshaw, respectively, both of whom are CPA's. Petitioner's Federal income tax return for 1973 was prepared by H. A. Stephens, an attorney. *142 Petitioner failed to tell the individuals who prepared his 1971, 1972, and 1973 Federal income tax returns that he owned a lottery and he failed to disclose any income from his lottery operations on his returns for said years. The following chart shows the taxable income reported on petitioner's returns, the taxable income as determined by respondent, and the amount of unreported taxable income determined by respondent. Taxable Income
Taxable Income
Unreported Taxable
Reported on
as Determined
Income as Determined
Year
Return
by Respondent [10]
by Respondent
1971
($5,259.00)
$151,582.35
$146,323.35
1972
($5,975.00)
$150,567.46
$144,592.46
1973
$50,605.23 $178,578.42
$127,973.19
ULTIMATE FINDINGS OF FACT Petitioner underreported income for all years in issue. Part of petitioner's underpayments of tax for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). OPINION We must determine *143 whether petitioner is liable for the deficiencies and additions to tax as determined by respondent for the years in issue. Issue 1: Income
We believe that the record provides ample support for respondent's determination of petitioner's lottery income for the years in issue. Moreover, petitioner has the burden of proving that such determination is erroneous and he failed to do so. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner did not report any income from lottery operations on his return for any of the years in issue. At trial, petitioner argued that he never participated in a lottery operation and consequently had no lottery income to report. This argument is totally without merit and is contrary to the evidence, including his conviction for owning the lottery. A taxpayer is required to maintain adequate books and records to enable him to file a correct return. Secs. 1.446-1(a)(4), 1.6001-1(a), Income Tax Regs. If a taxpayer fails to maintain adequate records, the Commissioner is authorized to reconstruct the taxpayer's income in accordance with such method as in his opinion does *144 clearly reflect income. Sec. 446(b). Since petitioner failed to maintain adequate books and records of his lottery operation, respondent had to reconstruct petitioner's lottery income for the years in issue from the wire tap transcripts and other records seized by the FBI. For the reasons set forth below, we uphold respondent's reconstruction of petitioner's taxable income from lottery operations. Our granting of respondent's Motion for a Partial Summary Judgment collaterally estopped petitioner from denying that he received gross wagers of $1,526,868, $1,520,809, and $1,290,567 for the taxable years 1971, 1972, and 1973; therefore, the real issue is whether respondent's reconstruction of petitioner's lottery expenses was reasonable. Respondent determined that petitioner's lottery expenses exceeded 90 percent of petitioner's gross wagers. In making this determination, respondent allowed expenses consisting of commissions for writers, ribbons, and pickup men in the amounts of 10 percent, 7.5 percent, and 6.75 percent of gross wagers, respectively. In addition, respondent allowed deductions for the cost of salaries paid to the other individuals involved in the lottery operations, *145 as well as the expenses of maintaining the trailer in which the tapped telephone was located. All of these expenses were clearly eatablished by the wire tap transcripts and other seized documents which were admitted into evidence, and we have found them as facts. Finally, respondent allowed a deduction of 44 percent of gross wagers paid out in hits. We have found that this percentage was a reasonable estimate of petitioner's actual pay out percentages based upon pay out rates of 300 to 1 for 300 numbers and 500 to 1 for 700 numbers. Based on this evidence of the expenses petitioner incurred in operating the lottery, we conclude that respondent's determination with respect to petitioner's lottery income must be sustained. Petitioner offered no evidence to suggest that respondent's reconstruction is erroneous, and consequently he has not met his burden of proof as to this issue. Welch v. Helvering,supra.Issue 2: Section 6653(b) Addition to Tax
Respondent determined that part of petitioner's underpayment of tax for each of the years at issue was due to fraud and, therefore, claims that the section 6653(b) fraud addition to tax should be imposed. Petitioner *146 denies that any underpayment of tax was due to fraud. For the reasons set forth below, we hold for respondent on this issue. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion, 578 F. 2d 1383 (8th Cir. 1978).Respondent has the burden of proving fraud for each year that it is alleged by clear and convicing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner,276 F. 2d 122, 128 (5th Cir. 1960); Beaver v. Commissioner,55 T.C. 85, 92 (1970).The taxpayer must be shown to have acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941); Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). Since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). A taxpayer's failure to satisfy his burden of proof *147 as to the deficiency determined by respondent does not, however, constitute proof of fraud. George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Pigman v. Commissioner,31 T.C. 356, 370 (1958). We have found that petitioner failed to report substantial amounts of income from his lottery operation over a period of three years. We based this finding not on the presumptive correctness of respondent's deficiency determination, but on the substantial evidence contained in the record, including petitioner's conviction for owning an illegal lottery, the District Court's determination that petitioner failed to pay excise taxes on the gross wagers received therefrom, and the wire tap and other lottery records obtained by the FBI. It is well established that a consistent failure to report substantial amounts of income over a number of years is effective evidence of fraudulent intent. Gromacki v. Commissioner,361 F. 2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Schwarzkopf v. Commissioner,246 F. 2d 731 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Romer v. Commissioner,28 T.C. 1228 (1957). *148 In addition, petitioner's failure to maintain adequate records with respect to his lottery operation is further evidence to support a finding of fraudulent intent to evade taxes. Parsons v. Commissioner,43 T.C. 378 (1964).The fact that petitioner failed to disclose his lottery income to the individuals who prepared his returns is further evidence of an intent to conceal income and evade taxes. Farber v. Commissioner,43 T.C. 407 (1965). On these facts, we hold that respondent has by clear and convincing evidence established that petitioner is liable for the fraud addition to tax for all years in issue. Due to concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. See n. 9, second paragraph. ↩
2. Petitioner has conceded liability for the section 6654(a) addition to tax.↩
3. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. The first two digits of the winning number were determined by the hundred thousand and ten thousand dollar digits of the total bond sales on a given day and the third digit was determined by the ten thousand digit from the figure representing the units of stock traded on the New Stock Exchange on the same day. ↩
5. Three way numbers are three digit numbers in which two of the three digits are the same. Triple numbers are three digit numbers in which all three digits are the same. Cut numbers are numbers in which the payout rate is reduced to discourage betting. Six way numbers are three digit numbers in which none of the numbers are the same. ↩
6. The gross payout percentage was calculated by determining that 300 of 1,000 numbers paid 300 to 1 and 700 of 1,000 numbers paid 500 to 1. Thus, 300/1,000 X 300 + 700/1,000 X 500 / 1,000 = 44% ↩
7. Pickup men also distributed money needed to cover winning wagers.↩
8. The following list shows the employees who participated in petitioner's lottery and their weekly salaries: ↩
Name
Amount
Gordon Pirkle
$ 525.56
Marshall Pyron: Salary
100.00
Commission
262.78
"EM" (Mrs. Connie Warren and W. W. Anderson)
450.00
Mrs. Ralph T. Snead (Dot)
200.00
Barbara Cleveland (DC)
200.00
Matilda Taylor (Mae)
65.00
Mrs. Frank Byrd (Marian)
50.00
Catherine B. Haley (Cat)
35.00
Lee
100.00
Total
$1,988.34
9. These gross wager figures were determined by respondent's expert, Wallace Herring, who computed petitioner's gross wagers on a daily basis for the 12 days for which he had wire tap transcripts and other seized documents. Based on his conclusion that petitioner maintained the lottery operation for 252, 251, and 213 days, respectively, in 1971, 1972, and 1973, he calculated petitioner's annual gross lottery income by multiplying the average daily gross income by the number of days petitioner operated the lottery each year.
Herring's reconstruction of petitioner's net wagering income differs from that determined by respondent in the Statutory Notice of Deficiency because Herring determined that petitioner paid 44 percent of gross wagers in hits, whereas respondent, in the Statutory Notice of Deficiency, determined that petitioner paid 50 percent of net wagers after commissions in hits. Respondent has conceded that Herring's determination that petitioner paid out 44 percent of gross wagers is correct.↩
10. Subject to respondent's concession at trial that the deficiencies and additions to tax for each year in issue were less than that determined in the Statutory Notice of Deficiency.↩